**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
CASE NO.: 0:18-cv-61844-WPD

MICHAEL A. LOPEZ, on behalf of
himself and all others similarly situated,

       Plaintiff,

v.

PROGRESSIVE SELECT
INSURANCE CO.,

       Defendant.

_____/

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Michael A. Lopez ("Plaintiff"), by and through undersigned counsel, files his Response in Opposition to Defendant, Progressive Select Insurance Company's ("Defendant or Progressive") Motion for Partial Summary Judgment, and in support states:

## I.     **INTRODUCTION**

"*Insurance is unlike Forrest Gump's box of chocolates. The insured is entitled to know exactly what it's getting for its premiums.*"  *United States Fire Ins. Co. v. Fleekop*, 682 So. 2d 620, 628, fn. 9 (Fla. 3d DCA. 1996).  Plaintiff's case is a simple one: His Policy with Defendant does not allow it to permanently take title to his total loss vehicle as a condition of his receiving his actual cash value payment under the Policy.  In an attempt to avoid this simple truth, Defendant misstates Plaintiff's claim and misstates the evidence in the record.

Plaintiff and each Class Member were insured under Defendant's Policy.  Each suffered an accident in which Defendant declared their vehicles total losses.  Under the express Policy language, in cases of total losses, Defendant agrees to pay insureds actual cash value with the only condition being that the payment be reduced by the "applicable deductible." However, for Plaintiff and Class Members, Defendant added another condition in breach of the Policy, requiring them to permanently transfer title to Defendant in order to receive their actual cash value payments under the Policy.  By breaching the policy in this manner, instead of actual cash value minus the deductible it owes under the express Policy terms, Defendant paid insureds (including Plaintiff and the Classes) actual cash value minus the applicable deductible *and* minus their total loss vehicles Defendant required be transferred to it.

Under long-standing Florida law on policy interpretation, Defendant's added condition breaches this payment term of the Policy. As compensatory damages for this breach, Plaintiff seeks

the money Defendant received when it sold his totaled vehicle it took in violation of the contract. Plaintiff's case is that straightforward.

Knowing that it has breached the Policy and received a windfall from selling Plaintiff's vehicle, Defendant engages in melodrama, referring to Plaintiff's position as "clearly absurd" and "upending" the insurance industry. Unfortunately for Progressive, its histrionics in describing Plaintiff's claim are belied by black-letter Florida insurance law. Moreover, Defendant knows that it must include language in its Policy allowing it to condition payments on receiving title to vehicles, because *it has expressly included such language in other motor vehicle insurance policies* it offers. Far from an "absurd" claim, Defendant's own policies prove that Plaintiff's interpretation of the Policy is correct.

As detailed below and in Plaintiff's Response and Statement of Additional Material Facts filed contemporaneously, Defendant's Motion for Summary Judgment ("Motion") is fundamentally flawed in numerous respects and should be denied.

## II.   LEGAL ARGUMENT

### A. Defendant has breached the Policy.

#### 1.   Specific Policy language is at issue in Plaintiff's case.

Plaintiff's legal theory has not fundamentally changed. (*compare* ECF No. 72 and ECF No. 75-1, at 2, 7, 12-14, 18, with ECF No. 18 ("Complaint") at ¶¶ 4, 6, 52, 69); *see also* ECF No. 87 at 3-4 (explaining the evolution of the Parties' positions on the Policy text). As the Court found previously, Plaintiff's claim presents a "monumental coverage issue" under the Policy. (ECF No. 56 at 6).

Specifically, under the general insuring agreement of the Policy, Defendant agrees to insure individuals according to the terms, conditions, and limitations of the Policy, which include its payment obligations. (Policy at form page 1). For Comprehensive Coverage, the Policy provides

in relevant part the insuring agreement that "If **you** *pay* the premium for this coverage, **we** will *pay* for sudden, direct, and accidental loss to a: **covered auto**…" (Policy at form page 23) (bold in original, italics added).  For Collision Coverage, the Policy provides in relevant part the insuring agreement that "If **you** *pay* the premium for this coverage, **we** will *pay* for sudden, direct, and accidental loss to a: **covered auto**…" *Id.* at 23. (bold in original, italics added).

When there is a total loss as there was for Plaintiff, Class Members, and Subclass Members,[1] and Defendant chooses not to repair or replace the vehicle, under the "Limits of Liability" provision (Policy at form page 28) for both Comprehensive and Collision coverages, the Policy is clear that Defendant is obligated to pay (and as a matter of course did pay) them what it deemed the "actual cash value of the …damaged property at the time of the loss." (Motion at 9; ECF No. 95 at ¶¶ 7, 46; ECF No. 99-2 at ¶ 7, 46).  The Policy is equally clear that Defendant is only permitted to take one reduction from the actual cash value payment for an "applicable deductible." Except for this condition, Defendant's Policy otherwise states an unconditional obligation on Defendant to pay actual cash value to insureds suffering total losses. This provision reads in pertinent part, in paragraph 1.a., below,

**LIMITS OF LIABILITY**

1.  The limit of liability for loss to a **covered auto, non-owned auto,** or **custom parts or equipment** is the lowest of:
    a.  the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
    b.  the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
    c.  the amount necessary to repair the damaged property to its pre-loss physical condition reduced by the applicable deductible; or
    d.  the Stated Amount shown on the **declarations page** for that **covered auto**;

(Policy at form page 28).

---

[1] Plaintiff's definition of the Class appears in ECF No. 72 at 1.

### 2. The breach Plaintiff alleges is based on the insuring agreement and payment provisions of the Policy.

But for Plaintiff and the tens of thousands of other members of the Classes (*see* ECF No. 1-3 at ¶ 5; ECF No. 72 at 7; ECF No. 72-6 at 3), Defendant did not stop there.  As explained in Plaintiff's Motion for Partial Summary Judgment (ECF No. 94 at Sections II B. and IV B; ECF No. 99-1 at Sections II B and IV B (under seal)), Defendant adds and enforces another condition that breaches this unconditional payment obligation provision of the Policy. Black-letter Florida law requires Defendant to "specify" the risks insured against and "any conditions" applying in the coverage in the Policy. (ECF No. 94 at 12-13).  Florida law also forbids Defendant from adding (and enforcing) another condition under the Policy that to receive actual cash value payments under the Policy, the insured must transfer title to his or her vehicle to Defendant and with no compensation to insureds for the post-loss value of the vehicle. (*See* Facts Resp. Response ¶¶ 8, 20; *see also* ECF No. 95 at ¶¶ 11, 14, 37-38; ECF No. 99-2 at ¶¶ 11, 14, 37-38; ECF No. 56 at 5-6 (Florida law on Policy interpretation); ECF No. 94 at 12-13 (Florida law including *Bastien* and *Roth*, prohibiting reading terms into an insurance policy).  Essentially, in violation of the Policy, Defendant has enforced and added to the Policy's insuring agreement payment term that it will pay insureds "the actual cash value of the stolen or damaged property at the time of the loss" minus the "applicable deductible," another condition that it will only pay the actual cash value of the stolen or damaged property at the time of the loss on the condition that the insured permanently transfer ownership of the automobile.

Plaintiff's case is unlike the cases Defendant relies on (Motion at 9-10) that were not based on insurance-policy coverage disputes. *See Nat'l Ass'n of Prof'l Allstate Agents v. Allstate Ins. Co.*, No. 8:01-CV-2137-T24MSS, 2002 WL 34940469, at *6 (M.D. Fla. Apr. 22, 2002) (employment contract completely silent on the topic at issue); *Negron v. CitiMortgage Inc.*, No.

16-CIV-61776, 2016 WL 10953267, at *6 (S.D. Fla. Oct. 19, 2016) (mortgage paperwork completely silent as to contractual relationship with non-contracting third party); *Lamb v. Outback Steakhouse of Fla., Inc*., No. 8:13-CV-794-T-35MAP, 2014 WL 12689882, at *8 (M.D. Fla. Sept. 4, 2014) (employment contract with absolutely no mention of renewal, arbitration, et al.).[2]

Interestingly, although not an insurance case per se, the *Allstate* case actually supports Plaintiff's theory.  The court upheld the count in the underlying complaint in which the plaintiff (as here) alleged the defendant had enforced "additional terms not contained within the Agreement."  As a consequence, the Court held,  "given that Florida courts recognize latent ambiguities, especially when a 'contract fails to specify the rights and duties of the parties in certain situations ... or a choice between two possible meanings,' the claim is sufficient to state a valid cause of action for breach of contract…."  2002 WL 34940469, at *5.  As this Court noted in *Roth* (discussed in ECF No. 94 at 12-14), it is hornbook law that if the Court finds the Policy ambiguous, it must be interpreted liberally in favor of Plaintiff and each Class Member and Subclass Member and strictly against Defendant. (*Roth,* 2018 WL 3412852, at *3) ("any ambiguities in the policy shall be construed against the insurer and in favor of the insured and coverage") (*see also* ECF No. 94 at 12) (collecting cases).

### B. Defendant knows its Policy form supports Plaintiff's interpretation rather than Defendant's and that Plaintiff's interpretation is not "absurd" or "upending."

Defendant knows that the foregoing provisions and others in the Policy do not support its position in this case but support Plaintiff's, which undercuts it entire Motion. Defendant effectively admitted as much in Florida Office of Insurance Regulation ("FL OIR") policy filings **submitted**

---

[2]The other case, *Ocean View Towers Ass'n, Inc. v. QBE Ins. Corp.*, 11-60447-CIV, 2011 WL 6754063, at *2 (S.D. Fla. Dec. 22, 2011), is unlike this case because the policy was completely silent on the issue of "matching."

**by Defendant's in-house corporate law department**. (Plaintiff Responses to Defendant Statement of Facts ("Fact Resp.") Add'l Fact No. 10)

Specifically, in FL OIR Filing 10-17609 for its Florida Motor Home Policy Form 9638 FL (07/10) (Facts Resp. Add'l Fact Nos. 1-2), which is identical in relevant parts to the Policy, Defendant admitted that its prior policy language regarding the Collision and Comprehensive coverages had "no provision describing…when we keep salvage for any loss" (*Id.*), and it advised the FL OIR it was changing its policy to remedy this omission by inserting the following language under the heading SALVAGE, which states the condition Defendant imposes on Plaintiff and the Classes:

## SALVAGE

If **we** pay the actual cash value of **your covered vehicle** less any applicable deductible, or if **we** pay the amount necessary to replace **your covered vehicle** less any applicable deductible, **we** are entitled to all salvage. If **we** determine that **your covered vehicle** is a total loss and **we** pay the applicable limit of liability shown on the **declarations page**, **we** are entitled to the same percent of salvage as **our** payment bears to the actual cash value of **your covered vehicle**.

(Facts Resp. Add'l Fact No. 3). Critically, in its Explanatory Memorandum filed to explain Form 9638 FL (07/10), Defendant represented to the FL OIR that these new limitations on its insureds salvage rights were "Decreases in coverage." (Declaration of Edward Zebersky ("Zebersky Decl."---attached to Facts Resp.) Exhibit B, memo at 4).

In the new version of the motor home policy, all the relevant language in Part IV-DAMAGE TO A VEHICLE other than the new above-quoted SALVAGE provision—the Collision and Comprehensive Coverages (Zebersky Decl., Ex. B, policy form page 20), the Limits of Liability (1) & (5)(b) & (c) (*Id.*, policy form pages 42-43), Payment of Loss (*Id.*, policy form pages 43-44), and provision on preserving salvage (*Id.*, policy form page 59) Defendant relies on in its Motion

(at 13) is substantially identical to the language in the Policy at issue. (*Compare* with Plaintiff's Policy at form pages 23, 28, 30, 39). Accordingly, if this similar policy language gave Defendant the right to take ownership of total loss vehicles or deduct salvage from actual cash value payments, there would have been no need to add the SALVAGE provision to the motor home policy. Defendant knew that the language at issue in this case gave it no such right and told FL OIR as much in 2010.

This language used in Defendant's Florida Motor Home Policy Form 9638 FL (07/10) is consistent with other motor vehicle policies issued by it in Florida.  For instance, based on FL OIR Filing 19-126142, Defendant's sister entity Progressive Express Insurance Company in its Commercial Auto Policy Form 6912 (02/19), not only includes specific salvage handling language under a separate heading titled SALVAGE nearly identical to the paragraph quoted above (Facts Resp. Add'l Fact Nos. 4-5), it specifically states that title must be conveyed to the insurer if it pays the insured actual cash value,  stating,

> **You** must convey title to and possession of the damaged, destroyed, or stolen property to **us** if **we** pay the actual cash value of **your insured auto** less the deductible or if **we** pay the amount necessary to replace **your insured auto** less the deductible.

(Facts Resp. Add'l Fact No. 5).

Moreover, in 2006, in FL OIR filing Number 06-01938 Defendant changed its standard form Personal Auto Insurance Policy at issue in this case to *remove* a deduction for salvage value from the actual cash value payment on a total loss vehicle. Following is a redlined version of the Policy filed by Defendant for the purpose of showing FL OIR what changes were being made to the prior version of the Policy:

**LIMITS OF LIABILITY**

1. The limit of liability for loss to a **covered ~~vehicle~~ auto**, **non-owned ~~vehicle~~ auto**, or **~~trailer~~ custom parts or equipment** is the lowest of:

   a. the actual cash value of the stolen or damaged property at the time of the loss, reduced by the applicable deductible ~~shown on the **Declarations Page**, and by its salvage value if **you** or the **owner** retain the salvage~~;

   b. the amount necessary to replace the stolen or damaged property, reduced by the applicable deductible ~~shown on the **Declarations Page**, and by its salvage value if **you** or the **owner** retain the salvage~~;

   c. the amount necessary to repair the damaged property to its pre-loss physical condition, reduced by the applicable deductible ~~shown on the **Declarations Page**~~; or

   d. ~~any applicable Limits of Liability or Stated Amount Vehicle Coverage elected by **you**, reduced by its salvage value if **you** or the **owner** retain the salvage.~~ the Stated Amount shown on the **declarations page** for that **covered auto**;

(Facts Resp. Add'l Fact Nos. 6-7) (highlighting added) (*compare* Policy at form page 28).

 So, prior to the amendment, the standard policy format issue contained language making its coverage exactly what Defendant now claims it to be, **and it deliberately deleted that language**, showing it intended to change the amount payable on a total loss from pre-damage value minus post-damage value (salvage) minus the deductible, to simply pre-damage value minus the deductible. In the explanatory memorandum, it told FL OIR that the package of amendments involved "increases and decreases in coverage." (Facts Resp. Add'l Fact No. 8). Of course, this change deleting a salvage deduction is an increase in coverage, the exact opposite of the amendment to the motor home policy giving Defendant the right retain salvage that it termed a "decrease in coverage." Thus, Defendant knew that the change to the Policy deleting the salvage deduction constituted an "increase in coverage."

 These materials show that Plaintiff's interpretation of the Policy is not absurd (Motion at 16), inconsistent with Actual Cash Value policies (*Id*. at 16-17), giving insureds a "windfall," (*Id*. at 7-8), and potentially upending the Florida automobile insurance industry (*Id*. at 7). Other insurers have also included specific provisions on taking totaled vehicles and salvage deductions.

(ECF No. 94 at 19-20). Defendant knew precisely what it offered Plaintiff and Class Members as a result of the 2006 amendment. That amendment was part of a package of increases and decreases in coverage, which Defendant told FL OIR would be neutral overall or represent a slight increase in coverage (loss payments). (Facts Resp. Add'l Fact No. 8). In other words, when considered in the context of the amendment package, Defendant expected no financial impact or only a slight financial impact from changing the Policy to require payment of "actual cash value" with no salvage value deduction or taking of total loss vehicles.

These materials clearly show Defendant knows how to draft a policy that unambiguously permits it to take the damaged vehicle in a total loss scenario in exchange for actual cash value.  Indeed, as stated above, the Policy at issue used to allow the economic equivalent of that (deducting salvage value from actual cash value), and Defendant deliberately gave up that right. The only reasonable interpretation of the Policy is that it requires Defendant to unconditionally pay pre-damage value on total loss claims and that Defendant breaches the Policy by conditioning such payment on its insureds transferring ownership to it of their total loss vehicles.

### C. Defendant indisputably conditions payments of actual cash value payments on transferring totaled vehicles to Defendant.

Contrary to what Defendant argues (Motion at 10), there is no credible dispute that Defendant routinely conditioned payment of actual cash value to Plaintiff, Class Members, and Subclass Members all of whom did not keep their vehicle.

The undisputed evidence shows that to accept an actual cash value payment, insureds must sign (as Plaintiff and the Classes did) documents transferring ownership of their damaged vehicle to the Defendant before they are given a check for the payment. (Deposition of Jason Peters ("Peters Dep.") (ECF No. 75-2, under seal) at 77:8-24 & 78:21-25 ("in exchange for their title, we

would hand them a draft in the agreed amount of their vehicle and they would have to sign some documents") (Facts Resp. Response ¶¶ 8-9, 20). The Salvage Webinar ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ (Facts Resp. Response ¶ 20).  Also, Defendant's website discussed in the Peters Deposition specifies an insured must transfer title and power of attorney must be provided by an insured *before* Defendant will issue a total loss payment to an insured.  Peters Dep at 146:14-147:3 ("What paperwork do you need before you can issue [my total loss settlement] payment?"—Defendant tells insureds that it will need to obtain physical title to their vehicles). (Facts Resp. Response ¶ 20).

Rather than admit this clear fact, Defendant attempts to confuse this issue by asserting an exception to this rule when an insured demands to keep his/her vehicle and then that insured is subject to a penalty and further reduction of actual cash value payments. (Motion at 7, 10, 20) (Facts Resp. Response ¶ 9).  But these scenarios are irrelevant to this case because these persons are not part of the Classes. (ECF No. 72 n. 2).   While Defendant attempts to cast Plaintiff in a bad light because he has excluded these individuals from the Classes (Motion at 20), that position is pointless. Indeed, Defendant is breaching the Policy with respect to those insureds as well by reading its Policy to permit it to deduct from their actual cash value payments amounts for "salvage value."   As with Plaintiff's class claims, this condition is nowhere in the insurance Policy.  And as with the condition it reads into the Policy, Defendant knows how to draft a policy to afford the right to reduce actual cash value payments by the salvage value when an insured keeps a vehicle.

However, in 2005-2006, Defendant made the conscious decision to remove the very language that would permit it to reduce payment of actual cash value by the salvage value for insureds who keep their damaged vehicle. (*See* Facts Resp. Add'l Fact Nos. 6-8).

Moreover, these insureds are not part of the Classes only because their claims are not typical of Plaintiff's proposed Classes and not because the claims lack merit.  That said, if Defendant is willing to withdraw any procedural barrier to Plaintiff's representing a class of persons who kept their vehicles by receiving reduced actual cash value payments, Plaintiff will gladly file an amended Motion for Class Certification to include this subclass.

**D.  The one provision Defendant relies on does not apply.**

The one provision Defendant's cites that supposedly contemplates its added condition requiring insureds to transfer to it their titles to receive actual cash value payments or the reduction of actual cash value of insureds who retain vehicles does not apply.  It states, "[i]f [Defendant] retain[s] salvage, [it] [has] no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding." (ECF No. 72-1 ("Policy") at form page 39; Motion at 13).  This provision only mentions Defendant's duties under the limited scenario if it *retains* the salvaged vehicle, and not that it is *entitled to* the salvage vehicle. The quoted language appears in the general section of the Policy under the heading "Legal Action Against Us" (Policy at form page 39), not the coverages or limit of liability sections at issue at issue. *See* § 627.419(1), Fla. Stat. (policy to be read in its entirety); *Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013) (internal cites omitted) (plurality opinion) (policy must be read as a whole). It also certainly does not state that Defendant will condition actual cash value payments under the Policy upon transferring title to Defendant without compensation; Defendant's own representative could not identify it as a provision that authorized taking insureds' vehicles. (ECF No. 75-1, Peters

Dep. at 169:15-25 through 170:1-3).  Also, as stated above (§ II B), this provision is in the motor home and commercial auto policies to which Defendant has added provisions on salvage and taking insureds' total loss vehicles.  If this provision authorized Defendant's interpretation, these additions to those policies would have been unnecessary.

### E.  Defendant's foreign case law is inapposite.

None of the foreign case law Defendant cites (Motion at 17-18) detracts from the reasonableness of Plaintiff's interpretation of the Policy, which unlike this case law is based on Florida law and the specific policy at issue in this case. In fact, all of those cases are either based on state-specific statutory interpretations or on policies with different language than at issue here––language that is similar to either the Defendant's 2005 Personal Auto Policy or the current Motor Home or Commercial Auto Policies cited above. (*See* § II B).   The North Carolina case, *Allen v. American Sec. Ins. Co*., involved no policy interpretation; the sole basis for the suit was an alleged violation of a North Carolina statute. 280 S.E.2d 471, 472 (N.C. Ct. App.1981) (ECF No. 19 at 9 of 13); *see Gellman v. Cincinnati Ins. Co*., 602 F. Supp. 2d 705, 708 (W.D.N.C. 2009) (rejecting reliance on Allen as case involving no insurance policy and relying on the policy at issue and its text to determine the outcome). Similarly, the New Jersey case, *Dwane v. West Am. Ins. Co*., involved no policy or statutory interpretation and the New Jersey court offered no rationale, citation, or discussion for its incidental remark on salvage. 297 A.2d 865, 869 (N.J. Dist. Ct. 1972). The Louisiana case, *Kikendall v. American Progressive Ins. Co*., involved a theft of pick-up truck that was stripped and burned, an evidentiary dispute, an no reference to taking a vehicle without paying salvage; like *Dwayne*, the Louisiana court offered no rationale or discussion for its incidental remark on salvage. 457 So.2d 53, 58-9 (La. Ct. App. 1984). And the Rhode Island case, *Pawtucket Mut. Ins. Co. v. Gay*, 786 A.2d 383, 384-85 (R.I. 2001), did not even mention salvage.

Defendant relies most heavily on the Texas case, *Hamby v. State Farm Mut. Auto. Ins. Co.*, 137 S.W.3d 834 (Tex. App. 2004), and Alabama case, *Langford v. Federated Guar. Mut. Ins. Co.*, 543 So. 2d 675 (Ala. 1989), both of which are inapposite and Defendant's reliance on them somewhat ironic.  Defendant's reliance on *Hamby* is ironic, because the court relied on the phrase in the State Farm policy, stating the defendant "may keep all or part of the property at the agreed or appraised value," which Defendant has testified and averred in its Motion only applies to stolen vehicles not damaged ones, which are at issue here. *Id*. at 837. (Motion at 16; ECF No. 95 at ¶ 44).[3]  Also, unlike here (Facts Resp. Response ¶ 8) the insurer in *Hamby* offered the plaintiff the opportunity to keep the salvage vehicle, and that if he kept the car, his actual cash value would be reduced by an amount for salvage. *Hamby, id*. Presumably that policy provided the option to reduce actual cash value payments by the "salvage value" if the insured kept the vehicle like the Defendant's pre 2006 Personal Automobile Policy.

In *Langford*, the court for the most part simply cut and pasted a lower court decision into its opinion and offered little independent analysis. The plaintiff alleged that the insurer had misrepresented his rights and duties under Alabama law regarding salvage and turning over totaled vehicle to the insurer for actual cash value. 543 So. 2d at 677.  Reliance on *Langford* like *Hamby* is ironic, because like Defendant's other policies but unlike here, the policy in that case expressly

---

[3] This provision, found in the loss payment provision, states in relevant part that, "At our expense, we may return any recovered stolen property to you or to the address shown on the declarations page, with payment for any damage resulting from the theft. We may keep all or part of the property at the agreed or appraised value." Defendant interprets this phrase to be limited to stolen vehicles. (Motion at 15; Policy at form page 30 (Payment of Loss); ECF No. 72-13 at 4 (interrogatory answer).  Plaintiff does not agree with Defendant's interpretation of this phrase in the Policy and finds it ambiguous at best.  Moreover, as admitted by the Defendant, this language only applies to the Subclass (ECF No. 72 at 2).

stated that the insurer may "take the automobile" in the case of a loss. 543 So. 2d at 677.[4]  Also,

unlike *Langford*, Defendant ignores that under Florida law, the rights to the salvage of the motor

vehicle in cases of total loss remain with the insured.  *See Florida Farm Bureau Cas. v. Patterson*,

611 So. 2d 558 (Fla. 1st DCA 1993).

> **F.  Defendant's use of an expert report and self-serving view of "loss" do not trump the Policy provisions and Florida law.**

This case deals with policy interpretation, which according to Florida law is a question of

law for the Court.  *Jones v. Utica Mut. Ins. Co*., 463 So. 2d 1153, 1157 (Fla. 1985); *see also*

*Montgomery v. Aetna Cas. Sur. Co*., 898 F.2d 1537, 1541 n.9 (11th Cir. 1990).  Courts have

rejected any notion that expert opinion is needed (or legally proper) to assist the Court in its duties

to properly interpret an insurance policy.  *Montgomery*, 898 F.2d at 1541 n.9; *see also Granada*

*Ins. v. Ricks*, 12 So. 3d 276, 277 n.1 (Fla. 3d Cir. 2009) ("the meaning of an insurance contract is

a question of law, and thus not subject to opinion testimony").  "In interpreting an insurance

contract, a court should consider its terms as they would be understood by a reasonable layperson,

not an expert." *Colony Ins. Co. v. Nicholson*, No. 10-60042-CIV, 2010 WL 3522138, at *3 (S.D.

Fla. Sept. 8, 2010).

Recognizing its failure to properly write its Policy to effectuate the result it wants here,

Defendant has resorted to attempting to usurp the role of this Court by relying on an expert to

interpret its Policy.  Not only is this tactic legally prohibited, but the expert himself does not even

---

[4] Also, in Alabama where *Langford* was decided, Defendant has used a policy form containing the language Defendant wants the Court to read back into its Florida Policy, providing further evidence Defendant knows how to include salvage provisions when it wants to but did not in the Policy. *See Gill v. Progressive Direct Ins. Co*., No. 2:06-CV-1151-MEF, 2008 WL 130774, at *3 (M.D. Ala. Jan. 10, 2008).  This is another example of where Defendant properly inserted language into its own Policy to effectuate its right to the damaged property.  This language is missing in the Policy.

correctly interpret Florida law or the Policy—instead he contorts the definition of "actual cash value" into a concept using salvage value and future utility—a definition found nowhere in Florida law. Florida law clearly interprets "actual cash value" in this exact context, and that interpretation is not the one Defendant's expert advances. *See Sos v. State Farm Mut. Auto. Ins*. Co., 396 F. Supp. 3d 1074, 1079 (M.D. Fla. 2019) (citing *Goff v. State Farm FL*, 999 So. 2d 684 (Fla. 2d DCA 2009) and other cases that hold "actual cash value" to be replacement cost less depreciation); *see also Glover v. Lliberty Mut. Ins. Co*., No. 19-21900-CIV, 2019 WL 4917063, at *1 (S.D. Fla. Oct. 4, 2019) (holding that the statutory method for determining actual cash value in cases of total loss described in Section 626.9743(5), Florida Statutes, serves to furnish a definition of the undefined term "actual cash value" in the insurance policy). Thus, not only is expert testimony improper as a matter of law, but Defendant's expert advances a theory directly contrary to controlling Florida law.[5]

Defendant also attempts to convince this Court to adopt its self-serving definition of the word "loss," and how that word should be defined under the Policy to limit any payment to the Plaintiff. This argument fails as well, because the Policy is clear: When a vehicle is totaled the Defendant must pay the actual cash value amount minus a deductible.[6] While the term loss does appear in the "Limit of Liability" provision,[7] the use of the term "loss" here recognizes that

---

[5] Plaintiff disagrees that experts should be allowed to opine on matters of insurance policy interpretation and insurance law in this case. But if the Court were considering allowing expert testimony on these issues, Plaintiff has attached to his facts response a rebuttal expert report critiquing Defendant's expert's report.

[6] The remainder of the options under the "Limit of Liability" section like repairing or replacing are not at issue in a total loss situation where, like here, the insurance company has elected to pay the "actual cash value." (Policy at form page 28).

[7] "The limit of liability for a loss is the lowest of…the actual cash value of the stolen or damaged property…minus the applicable deductible." (*Id*.).

payment will only be made if there is some damage to a vehicle covered under the policy (a "loss"), rather than a limitation on payment amounts.

This reasonable interpretation of the Policy is based on the primary dictionary definition of "loss": "destruction, ruin" https://www.merriam-webster.com/dictionary/loss.   To support its implausible interpretation, Defendant rejects the primary definition for "loss" and asks the Court to consider the fifth of six definitions of "loss":  "decrease in amount, magnitude, or degree," such that in the context of a total loss, "loss" means the pre-loss value of the vehicle (its actual cash value) minus its post-loss value (its salvage value). (Motion at 19-20).  Plaintiff asserts that his interpretation is the only plausible interpretation in light of the language in the Policy; but at worst, even if both definitions are reasonable, the Policy language is ambiguous, requiring strict interpretation against the Defendant.  *Harrington v. Citizens Prop. Ins. Corp.*, 54 So. 3d 999, 1002 (Fla. 4th DCA 2010) (If an insurer does not define a policy term, "the insurer cannot take the position that there should be a 'narrow, restrictive interpretation of the coverage provided.'").

Defendant's citations to cases (*Stoudt v. Securities Inv. Co.*, 140 So.2d 122, 124-25 (Fla. 1st DCA 1962) and *Bowman v. State*, 698 So. 2d 615, 616 (Fla. 2d DCA 1997)) supposedly supporting its definition of "loss" (ECF 92 at 19-20) are unavailing.   Neither case actually addressed the meaning of "loss" rendering them not even potentially persuasive. Plaintiff does not make the argument rejected in *Swire Pacific Holdings, Inc. v. Zurich*, 845 So. 2d 161, 165 (Fla. 2003) and *Gen. Star Indem. Co. v. W. Florida Vill. Inn, Inc.*, 874 So. 2d 26, 33 (Fla. 2d DCA 2004) (Motion at 20) that the Policy is ambiguous merely because it does not define "loss." To the contrary, not only does Plaintiff articulate a specific interpretation and demonstrate it is reasonable, he also demonstrates that Defendant's interpretation of "loss" is not.

### G. Plaintiff's interpretation does not result in a windfall or incentive for insureds to profit by crashing and totaling their vehicles.

Plaintiff's claim of breach results in no windfall and double recovery for insureds, incentivizing them to crash their motor vehicles or otherwise. Defendant misunderstands what Plaintiff is requesting in the case. He is not asking for actual cash value (admittedly a separate concept from post-loss or salvage value) or an unpaid Policy benefit be paid under the Policy. Therefore, the purpose of the Policy as an actual cash value Policy is not at issue. (Motion at 21). Rather Plaintiff seeks compensatory damages caused by Defendant wrongfully taking title to insureds' total loss vehicles under the auspices of the Policy framework and contract and selling total loss vehicles at auction.

At bottom, Defendant creates a strawman argument to knock down, specifically, the notion that Plaintiff and the Classes would be made "more than whole" or receive double recovery if Defendant were to pay him in exchange for taking title to their vehicles. (Motion at 21-22). This strawman argument fails, because as Plaintiff has already demonstrated above, *nothing in the operative insurance contract* allowed Defendant to condition paying Plaintiff for his total loss on his signing over title of his vehicle to Defendant, or to reduce the value of what it paid Plaintiff for his loss if he did not turn over title. Defendant attempts to read into the contract terms that are not there, then it advances a damages theory based upon non-existent contract language.

Moreover, and as importantly, Defendant's predicament is one of its own making. By wrongfully taking the Plaintiff's damaged vehicle—that has some intrinsic value—and selling that vehicle, it has breached its Policy. If it chose, however, to abide by its Policy language and not take the Plaintiff's damaged vehicle it would not have to pay the Plaintiff anything.

Because Defendant's actions are wrongful and in breach of the Policy, Plaintiff and the Classes are entitled to compensatory damages for Defendant's sale of his vehicle. This is black-

letter contract law in Florida.  When a party breaches a contract, as Defendant has here, the plaintiff is entitled to damages to place him in the same position he would have occupied absent the breach. *See Perera v. Diolife LLC*, 274 So. 3d 1119, 1124 (Fla. 4th DCA 2019) ("[T]he goal of damages is to place the injured party in the same position in which it would have been had the breach not occurred.") (citations omitted); *Manor House, LLC v. Citizens Prop. Ins. Corp.*, 277 So. 3d 658, 661 (Fla. 5th DCA 2019) ("the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract."); *Hollister Inc. v. Zassi Holdings, Inc.*, 752 F. App'x 888, 893 (11th Cir. 2018) ("For the breach of contract claim, [Plaintiff] was entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract.") (quotations omitted).  And in the context of wrongfully taking a vehicle the compensatory damages as a result, which in this case is the money Defendant received when it sold his vehicle.  *See, e.g,
Desvigne v. Downtown Towing Co*., 865 So. 2d 541, 542 (Fla. 3d DCA 2003) (reversing final judgment for defendant and ordering judgment for plaintiff, holding "damages be awarded to [plaintiff] for the value of the car on the date the vehicle was sold, plus any other costs, fees, or damages the trial court deems are warranted.").

The one case Defendant cites, *Gen. Star Indem. Co. v. W. Florida Vill. Inn, Inc*., 874 So. 2d 26, 34 (Fla. 2d DCA 2004) (Motion at 22), regarding incentivizing insureds.  does not apply to dispel Plaintiff's damage theory.  The issue in that case was whether the deductible in commercial property policy should be applied to non-covered loss as well as covered loss under the policy. The court merely mentioned in passing that deductibles incentivize insureds to take care of their properties and to avoid trivial claims. *Id*. at 28. Here, the intentional damage of a vehicle would not be covered under the Policy, which only protects against accidental loss for both

comprehensive and collision coverages and is excluded. (Policy at form page 23, 27).  Moreover, the potential of post-loss value recovery is hardly an incentive for an insured to total his/her vehicle and risk extreme bodily injury or death in a crash.  This assertion by Defendant is frivolous.

**H.  Title statutes and DMV materials do not authorize Defendant's practices under the Policy.**

*Finally*, neither Section 319.30(3), Florida Statutes, nor the Florida DHSMV procedure TL 36 Defendant attaches to its Motion (ECF No 92-1) authorizes Defendant to condition actual cash value payments under the Policy upon transfer of title to Defendant. (Motion n. 5 & at 22).  Section 319.30(3)(b) simply puts the onus on carriers when declaring vehicles total losses to process title paperwork and to notify the state and the National Motor Vehicle Title Information System, stating,

> [A]n insurance company that pays money as compensation for the total loss of a motor vehicle or mobile home shall obtain the certificate of title for the motor vehicle or mobile home, make the required notification to the National Motor Vehicle Title Information System, and, within 72 hours after receiving such certificate of title, forward such title by the United States Postal Service, by another commercial delivery service, or by electronic means, when such means are made available by the department, to the department for processing.

§ 319.30(3)(b), Fla. Stat.  While as Defendant states this statute may require that Defendant obtain the title to process it, this statute expressly contemplates that the "owner *or* the insurance company" may dispose of the vehicle (but not before salvage title is issued). (*Id.*) ("The owner or insurance company, as applicable, may not dispose of a vehicle or mobile home that is a total loss before it obtains a salvage certificate of title or certificate of destruction from the department."). Florida DHSMV procedure TL 36 states nothing to the contrary and goes even further to state expressly that insureds may retain salvage vehicles (ECF No 92-1 at 25). Nothing in this statute or Florida DHSMV procedure TL 36 states that Defendant may condition actual cash value payment on the insured's transferring title permanently to Defendant.

## III. CONCLUSION

Therefore, in light of the foregoing and Plaintiff's Response and Statement of Additional

Material Facts filed contemporaneously, Defendant's Motion for Summary should be denied.

Dated: November 15, 2019

Respectfully Submitted,


By: *s/Edward H. Zebersky*
    Edward H. Zebersky, Esq. (FBN: 0908370)
    Mark S. Fistos, Esq. (FBN: 909191)
    ZEBERSKY PAYNE, LLP
    110 S.E. 6th Street, Suite 2150
    Ft. Lauderdale, FL  33301
    Tel.:  (954) 989-6333
    Fax:  (954) 989-7781
    Emails:  ezebersky@zpllp.com;
    mfistos@zpllp.com; ndiaz@zpllp.com

    and

    Alec Schultz, Esq. (FBN: 35022)
    Carly A. Kligler, Esq. (FBN: 83980)
    LEÓN COSGROVE, LLP
    255 Alhambra Circle, Suite 800
    Coral Gables, FL  33134
    Tel.:  (305) 740-1975
    Fax:  (305) 437-8158
    Emails:  aschultz@leoncosgrove.com;
    ckligler@leoncosgrove.com;
    eperez@leoncosgrove.com;
    cmanzano@leoncosgrove.com

    *Attorneys for Plaintiff*